**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| JEFFREY RAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| ABB Inc. ) | |
| d/b/a ABB DE Inc., ) | |
| ) | |
| Defendant. ) | JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW Plaintiff Jeffrey Ray, by and through counsel, and for his Complaint against Defendant ABB Inc. d/b/a ABB DE Inc., states and alleges as follows:

### Parties

1. Plaintiff Jeffrey Ray is a citizen of the state of Illinois.

2. Defendant ABB Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business in Cary, North Carolina. Defendant does business in Missouri under the name ABB DE Inc.

3. At all times relevant to this action, Defendant operated a transformer plant in the City of St. Louis, Missouri.

### Jurisdiction and Venue

4. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, in that this action arises under the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1391, in that Defendant resides in the Eastern District of Missouri and the events or omissions giving rise to the claim in

this action occurred in the Eastern District of Missouri.

## General Factual Allegations

6. Plaintiff was employed by Defendant from 1996 until approximately August 5, 2017.

7. Throughout his employment with Defendant, Plaintiff worked at Defendant's transformer plant located at 4350 Semple Avenue in the City of St. Louis, Missouri.

8. At the end of his employment with Defendant, Plaintiff was working as an electrical wireman on the first shift.

9. At all times relevant to this action, Plaintiff was qualified to perform the essential functions of his job and he performed the duties of his job in a satisfactory manner.

10. In January 2010, the St. Louis transformer plant was the site of a workplace shooting in which four people were killed, including the gunman. Plaintiff was present at the transformer plant when the shooting began. The gunman shot at Plaintiff several times, but Plaintiff was able to escape harm and warn other employees in the plant.

11. Plaintiff believed that the shooting occurred because the gunman was upset that David Cain ("Cain"), who was the Production/Operations Manager for the St. Louis transformer plant at the time of the shooting, promoted a younger employee with less seniority than the gunman to a job in which the gunman was interested.

12. Upon information and belief, in 2010, Cain took a leave of absence from the St. Louis transformer plant and returned to the plant in approximately 2012 to work in a different job.

13. For several years after Cain returned to the St. Louis transformer plant, Plaintiff did not have any regular contact with Cain because they worked in different areas of the plant.

14. On or about June 2, 2017, Plaintiff's immediate supervisor, Jeff Curtis ("Curtis"),

told Plaintiff that Cain was going to be returning to the factory floor where Plaintiff worked and that Cain would be sharing Curtis's office.

15. Because Cain also worked on the first shift, his return to the factory floor meant that Plaintiff was going to have regular contact with Cain as part of his job.

16. Plaintiff became extremely upset when he learned that he would have to work closely with Cain because he felt that Cain was responsible for the shooting that occurred in 2010.

17. Plaintiff immediately went to speak to Bob Barciszewski ("Barciszewski"), who, at that time, was the Director of Operations for the St. Louis transformer plant.

18. Plaintiff asked Barciszewski why Cain was going to be working on the factory floor and he told Barciszewski that Cain was the person who he believed was responsible for the shooting that occurred in 2010.

19. Barciszewski told Plaintiff that Cain did not have any supervisory authority over him, but that Cain would be working with Plaintiff.

20. Plaintiff also spoke to Chris Vansickle ("Vansickle"), who was employed as a Human Resources Business Partner at the St. Louis transformer plant. Vansickle told Plaintiff that he would need to call the company hotline if he had a complaint.

21. Vansickle also told Plaintiff that he thought Plaintiff might be experiencing symptoms of Post-Traumatic Stress Disorder ("PTSD"). He told Plaintiff that he should take time off work to try to get some help and that he did not want Plaintiff to return until he received treatment.

22. Vansickle also suggested that Plaintiff apply for short-term disability benefits through Defendant's insurance carrier.

23. During the following week, and for several weeks thereafter, Plaintiff received

treatment from a Licensed Clinical Social Worker ("LCSW"). The LCSW diagnosed Plaintiff with chronic PTSD.

24. The symptoms of Plaintiff's PTSD include difficulty sleeping, nightmares, repeated thoughts of the workplace shooting, anger, difficulty focusing and concentrating, hypervigilance, and avoidance of other people.

25. On or about June 8, 2017, pursuant to Defendant's policy and Vansickle's suggestion, Plaintiff applied for short-term disability benefits. Plaintiff informed his immediate supervisor that he was off work for medical reasons and that he would be using vacation time until he received a determination from the insurance carrier.

26. While he was off work, Plaintiff communicated with Vansickle at least once per week to update him on the status of Plaintiff's treatment and his claim for short-term disability benefits. Plaintiff told Vansickle that he had been diagnosed with PTSD and that his LCSW recommended that he take additional time off work.

27. On or about August 4, 2017, Plaintiff learned that the insurance carrier had denied his claim for short-term disability benefits.

28. Plaintiff immediately attempted to contact Vansickle and Barciszewski to speak to them about the insurance carrier's determination, but they were not available when Plaintiff called.

29. On August 5, 2017, Vansickle and Barciszewski called Plaintiff and told him that his employment with Defendant was being terminated as a result of accumulating too many points under the company's attendance policy.

30. Defendant's attendance policy provided for progressive discipline, but Plaintiff had never received any warnings or disciplinary actions under the attendance policy prior to his termination.

31. In addition, the attendance policy provided that absences due to illness or injury with a doctor's statement are not supposed to be assessed points under the policy.

## COUNT I

### Disability Discrimination in Violation of the Americans with Disabilities Act

32. Defendant is a "person" within the meaning of 42 U.S.C. § 12111(7) and 42 U.S.C. § 2000e(a).

33. Defendant is an "employer" within the meaning of 42 U.S.C. § 12111(5)(A) in that it is a person engaged in an industry affecting commerce and had 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

34. Defendant is a "covered entity" within the meaning of 42 U.S.C. § 12111(2).

35. At all times relevant to this action, Plaintiff was an "employee" of Defendant within the meaning of 42 U.S.C. § 12111(4).

36. Plaintiff's PTSD constitutes a "disability" within the meaning of 42 U.S.C. § 12102(1)(A) in that it is a mental impairment that substantially limits several of Plaintiff's major life activities, including, but not limited to, concentrating, thinking, sleeping, and interacting with others.

37. Plaintiff's PTSD also constitutes a "disability" within the meaning of 42 U.S.C. § 12102(1)(A) in that it substantially impairs Plaintiff's brain function.

38. Plaintiff is a "qualified individual" within the meaning of 42 U.S.C. 12111(8) in that, at all times relevant to this action, he was able to perform the essential functions of his job as an electrical wireman for Defendant, with or without reasonable accommodation.

39. Reasonable accommodations that would have allowed Plaintiff to perform the essential functions of his job included transferring Plaintiff to a different area of the plant or

moving him to a different shift so that he did not have to work in close proximity to Cain.

40. Defendant could have also allowed Plaintiff to exercise his right under Defendant's employee handbook to bump a less senior employee from another shift.

41. Prior to terminating Plaintiff's employment, Defendant did not engage in an interactive process to determine whether there were any reasonable accommodations available that would have allowed Plaintiff to perform the essential functions of his job.

42. Plaintiff's disability was a motivating factor in Defendant's decision to terminate his employment.

43. By failing to engage in an interactive process with Plaintiff, failing to provide a reasonable accommodation for Plaintiff's disability, and terminating Plaintiff's employment, Defendant discriminated against Plaintiff on the basis of his disability in violation of 42 U.S.C. § 12112.

44. On April 13, 2017, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), charge number 560-2018-01538, alleging disability discrimination by Defendant.

45. On March 6, 2019, the EEOC issued a Notice of Right to Sue to Plaintiff for charge number 560-2018-01538, allowing him to bring this action against Defendant. A copy of the Notice of Right to Sue is attached hereto as Exhibit 1.

46. Plaintiff has filed this action against Defendant within 90 days of the issuance of the Notice of Right to Sue.

47. As a direct and proximate result of Defendant's discriminatory actions as alleged herein, Plaintiff has sustained and will continue to sustain lost wages and benefits of employment.

48. As a direct and proximate result of Defendant's discriminatory actions as alleged

6

herein, Plaintiff has suffered emotional and mental distress.

49. As a direct and proximate result of Defendant's discriminatory actions as alleged herein, Plaintiff has incurred and will continue to incur attorneys' fees and costs of litigation.

50. In terminating Plaintiff's employment, Defendant acted with evil motive or intent or with reckless or callous indifference to Plaintiff's protected rights and, therefore, an award of punitive damages against Defendant is appropriate.

WHEREFORE, Plaintiff prays that the Court, after trial by jury, enter judgment in his favor and against Defendant, in amounts to be determined at trial, for economic losses, including prejudgment interest; for compensatory damages, including damages for emotional and mental distress; for punitive damages; for equitable relief, including reinstatement or, in the alternative, front pay; for attorneys' fees and costs of litigation; and for such further relief as the Court deems just and proper.

DOBSON, GOLDBERG, BERNS & RICH, LLP

By:  /s/ Gregory A. Rich
Gregory A. Rich, #MO45825
grich@dobsongoldberg.com
5017 Washington Place, Third Floor
St. Louis, MO 63108
Tel: (314) 621-8363
Fax: (314) 621-8366

Attorneys for Plaintiff